**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| TWIN CITY FIRE INSURANCE CO., <br><br> Plaintiff, <br><br> v. <br><br> OCEANEERING INTERNATIONAL, INC., JOHN R. HUFF, T. JAY COLLINS, JEROLD J. DESROCHE, D. MICHAEL HUGHES, HARRIS J. PAPPAS, PAUL B. MURPHY, JR., DAVID S. HOOKER and M. KEVIN MCEVOY, <br><br> Defendants. | C. A. No.4:16-cv-666 |

**MEMORANDUM OF PLAINTIFF TWIN CITY FIRE INSURANCE**
**COMPANY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY
Two Allen Center
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-2571

SKARZYNSKI BLACK LLC
One Battery Park Plaza, 32nd Floor
New York, New York 10004
Telephone: (212) 820-7700

*Attorneys for Plaintiff Twin City Fire*
*Insurance Co.*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF THE NATURE & STAGE OF THE PROCEEDING ....................................... 3

STATEMENT OF THE ISSUE ................................................................... 3

SUMMARY JUDGMENT EVIDENCE .............................................................. 3

THE STANDARD FOR THIS MOTION ........................................................... 4

    I.        SUMMARY JUDGMENT ............................................................ 4

    II.      POLICY INTERPRETATION AND BURDEN ............................................ 5

FACTUAL BACKGROUND ...................................................................... 5

    I.        THE UNDERLYING CHANCERY ACTION ............................................. 5

        A.     Factual Allegations from the Chancery Action ................................... 5

        B.     The Legal Claims in the Chancery Action .......................................... 9

        C.     The Chancery Action Expressly Seeks Disgorgement ......................... 9

    II.      THE POLICY, COVERAGE POSITION AND PROPOSED SETTLEMENT .......... 10

        A.     The Insurance Program ..................................................................... 10

        B.     The Initial Coverage Position and Reservation of Rights ................. 13

        C.     The Proposed Settlement ................................................................... 14

        D.     The Directors' Demand for Twin City to Commit to Funding a Settlement ........................................................................................... 16

        E.     The Issue Presented in this Action .................................................... 18

        F.     What is *NOT* in dispute .................................................................. 18

ARGUMENT .................................................................................... 20

    I.        THE POLICY DOES NOT PROVIDE COVERAGE FOR SETTLEMENT BECAUSE THE SETTLEMENT CONSTITUTES DISGORGEMENT .................... 20

i

A.   The Policy Does Not Provide Coverage for Disgorgement ............................... 20

B.   No Wrongdoing Need be Established ................................................................. 25

C.   Burks is Inapposite .......................................................................................... 27

D.   The Underlying Rationale for the Rule is Well-Rooted in Texas Law ............. 30

CONCLUSION ...................................................................................................................... 32

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Alaska Elec. Pension Fund v. Brown*,
   941 A.2d 1011 (Del. 2007) .................................................................. 8

*Ali v. Federal Insurance Co.*,
   719 F.3d 83 (2d Cir. 2013) ................................................................ 10

*Am. States Ins. Co. v. Bailey*,
   133 F.3d 363, 368 (5th Cir. 1998) ...................................................... 4

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ....................... 4

*Aon Corp. v Certain Underwriters at Lloyd's of London*,
   No. 06-16852 (Ill. Civ. Ct. Ch. Div. Dec. 3, 2010) ........................... 26

*AXA Re Prop. & Cas. Ins. Co. v. Day*,
   162 Fed. Appx. 316, 318-19 (5th Cir. 2006) (per curium) (same) ....... 4

*Bank of the West v. Superior Court*,
   833 P.2d 545 (Cal. 1992) ........................................................... 23, 32

*Big 5 Corp. v. Gulf Underwriters Ins. Co.*,
   2003 WL 22127029 (C.D. Cal. July 14, 2003),
   *aff'd*, 2005 WL 1529709 (9th Cir. June 30, 2005) ...................... 24, 27

*Bituminous Cas. Corp. v. Maxey*,
   110 S.W.3d 203 (Tex.App. – Houston [1st Dist.], pet. denied) ............. 5

*Burks v. XL Specialty Ins. Co.*,
   2015 WL 6949610 (Tex. App. – Houston [14th Dist.] Nov. 10, 2015, no pet.) ............... *passim*

*Camden Fire Ins. Ass'n v. Sutherland*,
   284 S.W. 927 (Tex. Comm'n App. 1926) .......................................... 31

*Cent. Dauphin Sch. Dist. v. Am. Cas. Co.*,
   426 A.2d 94 (Pa. 1981) ............................................................. 24, 31

*CNL Hotels & Resorts, Inc. v. Twin City*,
   291 Fed. Appx. 220 (11th Cir. 2008) ....................................... 19, 24, 26

*Coats v. Farmers Ins. Exch.*,
   230 S.W.3d 215 (Tex. App. – Houston [14th Dist.] 2006, no pet.) ......... 31

*Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*,
    130 S.W.3d 181 (Tex. App. – Houston [14th Dist.] 2003, pet. denied)....................................5

*Conseco, Inc. v. Nat'l Union Fire Ins. Co.*,
    2002 WL 31961447 (Ind. Cir. Ct. Dec. 31, 2002) ....................................................... 24, 26, 30

*Crisp v. Sec. Nat. Ins. Co.*,
    369 S.W.2d 326 (Tex. 1963) .................................................................................................... 31

*Dillon v. Rogers*,
    596 F.3d 260 (5th Cir. 2010)......................................................................................................4

*E & L Chipping Co. v. Hanover Ins. Co.*,
    962 S.W.2d 272 (Tex. App. – Beaumont 1998, no pet.)..........................................................27

*Evergreen Nat. Indem. Co. v. Tan It All, Inc.*,
    111 S.W.3d 669 (Tex. App. – Austin 2003, no pet.)..................................................................5

*Executive Risk Indem., Inc. v. Pac. Ed. Servs., Inc.*,
    451 F.Supp.2d 1147 (D. Haw. 2006) ................................................................................. 24, 32

*Fidelity Bank v. Chartis Specialty Ins. Co.*,
    2013 WL 4039414 (N.D. Ga. Aug. 7, 2013)............................................................................30

*Granite State Ins. Co. v. Aamco Transmissions, Inc.*,
    57 F.3d 316 (3d. Cir. 1995).......................................................................................................27

*In re Massey Energy Co.*,
    2011 WL 2176479 (Del. Ch. May 31, 2011) ...........................................................................12

*In re TransTexas Gas Corp.*,
    597 F.3d 298 (5th Cir. 2010)............................................................................... 20, 21, 28, 31

*J.P. Morgan Securities Inc. v. Vigilant Ins. Co.*,
    992 N.E.2d 1076 (N.Y. 2013) ........................................................................................ 23, 28, 32

*John M. O'Quinn P.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    33 F. Supp. 3d 756 (S.D. Tex. 2014) ................................................................................. 23, 31

*Level 3 Commc'ns, Inc. v. Federal Ins. Co.*,
    272 F.3d 908 (7th Cir. 2001).......................................................................................... *passim*

*McFaul v. Valenzuela*,
    684 F.3d 564 (5th Cir. 2012)......................................................................................................4

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
    312 U.S. 270, 271-74 (1941).......................................................................................................4

*Mountainside Holdings, LLC v. Am. Dynasty Surplus Lines Ins. Co.*,
   2014 WL 3055881 (Pa. Com. Pl. June 30, 2014),
   *aff'd*, 2014 WL 10047052 (Pa. Super. Ct. June 25, 2014)....................................... 24, 27

*Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.*,
   1993 WL 566032 (S.D. Tex. Oct. 8, 1993),
   *aff'd*, 76 F.3d 89 (5th Cir. 1996)........................................................................ 23

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. U.S. Bank, Nat. Ass'n*,
   2008 WL 2405975 (S.D. Tex. June 11, 2008) ....................................................... 20

*Nationwide Property & Cas. Ins. Co. v. Lafarge*,
   2011 WL 3702437, at *2 (S.D. Tex. Aug. 22, 2011) ............................................... 4

*Nortex Oil & Gas Corp. v. Harbor Ins. Co.*,
   456 S.W.2d 489 (Tex. App. – Dallas 1970, no writ) .................................. 21, 22, 31

*Performance Autoplex II Ltd. v. Mid–Continent Cas. Co.*,
   322 F.3d 847 (5th Cir. 2003)............................................................................... 5

*Progressive County Mut. Ins. Co. v. Sink*,
   107 S.W.3d 547 (Tex. 2003) ............................................................................... 5

*Reliance Group Holdings. Inc. v. Nat'l Union Fire Ins. Co.*,
   594 N.Y.S.2d 20 (N.Y. App. Div. 1993)....................................................... 23, 30

*Republic Western Ins. Co. v. Spierer, Woodward, Willens, Denis & Furstman*,
   68 F.3d 347 (9th Cir.1995).............................................................................. 24

*Rogers v. Bromac Title Servs., L.L.C.*,
   755 F.3d 347 (5th Cir. 2014)............................................................................... 4

*Ryerson Inc. v. Federal Ins. Co.*,
   76 F.3d 610 (7th Cir. 2012)............................................................... 24, 26, 31, 32

*Southcentral Employment Corp. v. Birmingham Fire Ins. Co.*,
   926 A.2d 977 (Pa. Super Ct. 2007) ................................................................... 26

*State Farm Lloyds v. C.M.W.*,
   53 S.W.3d 877 (Tex. App. – Dallas 2001, pet. denied) ........................................ 27

*U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*,
   2014 WL 3012969 (D. Minn. July 3, 2014).......................................................... 28

*U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*,
   __ F.3d ___, 2016 WL 2865578 (2d Cir. May 17, 2016) ....................................... 23

*Vigilant Ins. Co. v. Credit Suisse First Boston Corp.,*
   782 N.Y.S.2d 19 (1st Dep't 2004) ........................................................ 23

**Statutes**

28 U.S.C. §2201 ....................................................................................... 3

8 Del. C. § 102(b)(7) ............................................................................... 9

8 Del. C. § 145(b) .................................................................................... 12

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................... 4

Fed. R. Civ. P. 56 ................................................................................ 3, 4

Fed. R. Civ. P. 56(a) ............................................................................... 4

Fed. R. Civ. P. 57 .................................................................................... 3

**Other Authorities**

2-24 LIABILITY OF CORPORATE OFFICERS AND DIRECTORS § 24.07 .......................... 22

4-28 NEW APPLEMAN ON INSURANCE § 28.04(3)(c) ...................................... 22

## PRELIMINARY STATEMENT

The genesis of this insurance coverage declaratory judgment action was the decision by the non-employee corporate Directors (the "Non-Employee Directors")[1] of defendant Oceaneering International Inc. ("Oceaneering") to award themselves compensation packages that averaged over $1 million per year for each of the years 2011 through 2013.

Shareholders' dissatisfaction with these very rich self-pay decisions manifested itself in a shareholder derivative action in the Delaware Chancery Court (the "Chancery Action").  The Chancery Action alleges that the Non-Employee Directors awarded themselves compensation "vastly" in excess of "what a typical non-employee director receive[d] for performing similar services elsewhere."  *See* Ex. A-3, ¶ 33 - Verified Complaint in *Peter L. Jacobs, derivatively on behalf of Oceaneering International, Inc. v. John R. Huff, et al*., C.A. No. 977, annexed to the Principal Declaration of Anthony Fowler ("Fowler Dec.").  The Chancery Action Verified Complaint demands that these directors "***disgorge***" their excessive compensation to Oceaneering.  *Id*. ¶ 80, Prayer for Relief § A.

Plaintiff Twin City Fire Insurance Company ("Twin City") had issued a Directors and Officers' liability insurance policy, described in more detail below (the "Policy"), to Oceaneering.  When the Chancery Action was noticed as a claim under the Policy, Twin City agreed, subject to the applicable self-insured retention to fund the defense of the Chancery Action.  But consistently from the outset of the claim, Twin City has indicated that, to the extent that the directors return some or all of their compensation to Oceaneering, such disgorgement would not be insured under the Policy.

---

[1] The Non-Employee Directors are: John R. Huff, T. Jay Collins, Jerold J. DesRoche, D. Michael Hughes, McEvoy will collectively be referred to as the "Directors."

Long settled law holds that liability insurance does not and cannot cover settlements in the nature of disgorgement.  As discussed in detail below, this law has been recognized by the Fifth Circuit, under Texas law, and by dozens of other circuit, district and state courts around the country.

Despite that clear law, the instant declaratory action has become necessary because the directors have demanded that Twin City pay millions to Oceaneering to settle claims that they overpaid themselves and must disgorge the overpayments.  Although the Policy is a liability policy, under their skewed reading of the law, Twin City must pay money to its own insured, Oceaneering.  Were this view correct, the directors would get to pay themselves massive compensation from Oceaneering and then, when challenged, have the insurer pay the money back to Oceaneering so that the directors could keep the overpayments and Oceaneering would receive a cash infusion from its own insurer.   In other words, Oceaneering and the directors want to have their cake and eat it too.

As explained below, the law and common sense dictate that they are wrong.  Were insurance to cover disgorgement, the recognized bounds of insurability would not only be stretched, one of the most fundamental precepts of liability insurance would be shattered:  the only proper function of liability insurance is to prevent loss, not provide gain.  Yet the directors, who are insured against their liability to third parties, could pay themselves whatever they wished and take what company property they desired, safe in knowing that they will never have to give it back because the company will be made whole by liability insurance.  Indeed, they could, year-after-year, overpay themselves and simply "cash in" their insurance policy.  That is not and cannot be the law.

This action asks the Court to clarify whether and to what extent, under the Policy and applicable law and public policy, there is insurance coverage for any settlement of the Chancery Action pursuant to which the directors disgorge and give back to Oceaneering some of the their compensation.

## STATEMENT OF THE NATURE & STAGE OF THE PROCEEDING

Twin City filed its Original Complaint for Declaratory Judgment on March 14, 2016.  By agreement, Twin City, as well as the defendants, now seek declaratory relief under 28 U.S.C. § 2201 and Federal Rules of Civil Procedure 56 and 57, on the issue identified below.  The defendants answered and counterclaimed for essentially the reciprocal declaration.  As part of the Rule 16/26 meet-and-confer process, the defendants suggested (indeed insisted) upon immediate dispositive motions.  The parties agreed to brief cross-motions and the Court's scheduling order endorsed that agreement.

## STATEMENT OF THE ISSUE

Whether, under the Policy, Texas law and public policy, indemnity coverage exists to the extent any settlement of the Chancery Action results in a payment to Oceaneering in the nature of disgorgement of directors' compensation.  By this motion Twin City requests that the Court enter a declaratory judgment that it does not.

## SUMMARY JUDGMENT EVIDENCE

Twin City attaches and incorporates by reference the following evidence which accompanies its Motion for Summary Judgment:

Ex. A: Principal Declaration of Anthony Fowler, with Exhibits A-1 – A-5, which include the Policy (Ex. A-1) and Verified Complaint in the Chancery Action (Ex. A-3).

Ex. B:  Sealed Supplemental Declaration of Anthony Fowler, with Exhibits B-1 – B-10.

Ex. C:  Declaration of James Sandnes, with Exhibits C-1 – C-2.

## THE STANDARD FOR THIS MOTION

### I.    SUMMARY JUDGMENT

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   "[T]his court construes 'all facts and inferences in the light most favorable to the nonmoving party.'"  *McFaul v. Valenzuela,* 684 F.3d 564, 571 (5th Cir. 2012) (quoting *Dillon v. Rogers,* 596 F.3d 260, 266 (5th Cir. 2010)).   However, a "genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   *Rogers v. Bromac Title Servs., L.L.C.,* 755 F.3d 347, 350 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Here, there are no factual disputes.  Indeed, little extrinsic evidence outside the pleadings is being presented on this motion at all.  The main documents (the Policy and the complaint in the Chancery Action) were attachments to the pleadings.  Thus, this motion may well be viewed as a motion for judgment on the pleadings filed pursuant to Fed. R. Civ. P. 12(c).  However, because the Fowler declarations do provide some additional background information about the settlement process, this motion is being brought pursuant to Rule 56, not 12(c).[2]

---

[2]  Neither side disputes ripeness.  Nevertheless, Twin City is providing the settlement correspondence merely to give the Court comfort that a real ripe dispute of law is presented -- *i.e.,* that there are ongoing settlement discussions in the Chancery Action and that there has been a demand that Twin City commit to funding a proposed settlement offer.  *See, e.g., Md. Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 271-74 (1941) (an actual case or controversy existed where the insurer brought a declaratory judgment action regarding its liability to the insured for an underlying state court action while the underlying action was still pending); *AXA Re Prop. & Cas. Ins. Co. v. Day,* 162 Fed. Appx. 316, 318-19 (5th Cir. 2006) (per curium) (same); *Am. States Ins. Co. v. Bailey,* 133 F.3d 363, 368 (5th Cir. 1998) ("An actual controversy may exist when an insurance carrier seeks a declaratory judgment that it has a duty neither to defend nor indemnify its insured in a state court action that has not yet proceeded to judgment."); *Nationwide Property & Cas. Ins. Co. v. Lafarge,* 2011 WL 3702437, at *2 (S.D. Tex. Aug. 22, 2011) ("a declaratory judgment action . . . in which an insurer seeks a declaration that it is not liable to indemnify an insured for any damages an injured person may recover against the insured is justiciable").

## II.     POLICY INTERPRETATION AND BURDEN

Under Texas law, the same general rules that govern the interpretation of contracts govern the interpretation of insurance policies.  *See Performance Autoplex II Ltd. v. Mid–Continent Cas. Co.*, 322 F.3d 847, 853 (5th Cir. 2003); *Progressive County Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003).  Terms within an insurance contract are given "their plain, ordinary, and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning." *Bituminous Cas. Corp. v. Maxey*, 110 S.W.3d 203, 208–09 (Tex.App. – Houston [1st Dist.] 2003, pet. denied) (internal citation omitted).

However, the burden to establish coverage is on the insured directors.  As explained in greater detail below, the issue here is whether or not a settlement payment constituting disgorgement would come within the scope of Insuring Agreement A.  The insured bears the initial burden of showing its claim comes within the coverage afforded by the insuring agreement of the policy.  *Evergreen Nat. Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 675 (Tex. App. – Austin 2003, no pet.); *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 188 (Tex. App. – Houston [14th Dist.] 2003, pet. denied).

## FACTUAL BACKGROUND

## I.     THE UNDERLYING CHANCERY ACTION

### A.     Factual Allegations from the Chancery Action

In this insurance coverage dispute, the relevant facts are straightforward and undisputed. Oceaneering International, Inc., a multinational off-shore oil services/exploration company, is a Delaware corporation with its principal place of business here in Houston.  *See* Ex. C-1, page 10, April 3, 2015 Definitive Proxy Statement, attached to the Declaration of James Sandnes (the "Sandnes Dec.").  On June 17, 2014, an Oceaneering shareholder named Peter Jacobs instituted an action in the Chancery Court of Delaware, by way of verified Complaint, asserting that the

5

seven Non-Employee Directors paid themselves "excessive and unfair compensation" from 2011 to 2014.  Ex. A-3, ¶¶ 1, 45, 51, 73, 78-80.

At the times relevant to this dispute, Oceaneering's board consisted of eight members, defendant McEvoy, its CEO, and the seven "Non-Employee Directors," *i.e,* the other individual defendants listed in footnote 1 (collectively with McEvoy referred to as the "Directors").  The Directors were all named as defendants in that action.  Oceaneering is, of course, also named therein but only as a "Nominal Defendant."  *Id*. ¶ 9.

That derivative complaint alleges that the Non-Employee Directors are personally "responsible for determining their own compensation."  *Id.* ¶ 18.  The complaint indicates that the average total compensation received by the Non-Employee Directors was $1,161,655.80 in 2011, $908,956.83 in 2012, and $1,099,960.50 in 2013.[3]  *Id.* ¶¶ 30, 32.  Therefore, the average over these three years was $1,056,857.71 per year, per director.

For their million-plus annual compensation, the Non-Employee Directors needed to attend less than ten board meetings per year (and in some cases committee meetings).  *Id.* ¶ 48.

The Chancery Action complaint asserts that the Directors' compensation "is so far off the charts that it cannot be fairly characterized as anything but unfair and excessive."  *Id.* ¶ 37.  Specifically, the complaint provides detailed allegations based on how the Non-Employee Directors' compensation compares to the compensation awarded by 17 peer companies (the "Peer Group") to their own Non-Employee Directors.  *Id.* ¶¶ 35, 37.

Notably, Oceaneering's compensation committee allegedly compiled the list of 17 peer companies in connection with analyzing director compensation.  *Id.* ¶ 35.  Oceaneering falls near the median of this "Peer Group" in terms of market capitalization.  *Id.* ¶ 36.  Rather than the

---

[3] Plaintiff additionally challenges the fairness of certain "Performance Awards" received by defendant Collins.  *See id.* ¶¶ 52-60.

Oceaneering directors' compensation likewise being around the Peer Group median, the median compensation for Non-Employee Directors of peer companies was only $260,724 in 2011, $280,033 in 2012, and $265,613 in 2013. Over the three year period, this averaged $268,790 in compensation per year. Ex. A-3 at ¶¶ 38, 40, 42.

Accordingly, from 2011 to 2014, the average Non-Employee Director at Oceaneering received nearly four times more compensation than he would have had he been a director of one of the 17 companies that Oceaneering had itself identified as compensation peers.

Not only were the challenged payments allegedly far in excess of what the average peer company paid, but according to the statistics quoted in the Chancery Action, Oceaneering also paid its Non-Employee Directors almost three times what the next highest paying peer company paid over those three years. *Id.* Put in other words, the Chancery Action alleges that "out of the 149 directors in the Peer Group, [Director defendant] Huff was the highest paid director and the other Oceaneering directors received substantially more than every other [of the 149 peer group] director[s] save one." *Id.* ¶ 39. Exhibits A-C to the Chancery Action Complaint list the compensation received by each non-employee director in the Peer Group from 2011 through 2014, highlighting Plaintiff's claims that the compensation at issue was "far off the charts." *Id.* ¶ 37.

The Chancery Action complaint also asserts that the Non-Employee Directors' compensation is just as excessive when compared to other industrial and energy companies and large capitalization companies not included in the Peer Group. *Id.* ¶¶ 45-47. Although "during the 2011 through 2013 calendar years, [Oceaneering's] Compensation Committee adopted a compensation philosophy of targeting the compensation to be paid to Oceaneering's executive

officers at the 50th percentile of the executive compensation of the Peer Group," they put no such limitations on their own personal compensation. Ex. A-3 at ¶ 36.

In 2015, after the filing of the Chancery Action, Oceaneering amended its incentive plan to limit the amount of compensation that can be awarded to the Non-Employee Directors each year. Ex. C-1 at 12-13. The effect was almost immediate. According to Oceaneering's most recent proxy, dated April 8, 2016, the non-employee director compensation for 2015 was:

| | |
|---|---|
| John R. Huff | $2,577,019 |
| T. Jay Collins | $307,290 |
| Jerold J. DesRoche | $163,455 |
| D. Michael Hughes | $320,320 |
| Paul B. Murphy, Jr. | $332,453 |
| Harris J. Pappas | $295,043 |
| Steven A. Webster | $279,726 |

Ex. C-2 at 36.

Thus, rather than receiving an average of over $1 million, all but one of the Directors is now much closer to the Peer Group. Huff apparently remains high because of ongoing severance obligations owed to him as Oceaneering's former CEO, *see id.* at 36, but even including him, the average has dropped by over $400,000 per director, per year from the 2011-14 levels.

Under the applicable Delaware law, there is already a presumption that the derivative suit caused this benefit. *See, e.g.*, *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011, 1015 (Del. 2007). In other words, the Non-Employee Directors' decision to cut their compensation by an average of $400,000 per year is legally presumed to have been caused by and be the effect of the Chancery Action.

### B.     The Legal Claims in the Chancery Action

The Chancery Action Verified Complaint asserts two claims, derivatively on behalf of Oceaneering, against the Directors.  Ex. A-3, ¶¶ 71-81.

The claim for unjust enrichment is asserted only against the Non-Employee Directors who allegedly received "excessive and unfair payments" and thus must "disgorge" those amounts.  *Id.* ¶¶ 77-81.  Because McEvoy is the CEO and, thus, is compensated jointly for his services as an employee and a director, he is not a defendant under this claim.

The other cause of action is for breach of fiduciary duty against all of the Directors, including McEvoy.  *Id.* ¶¶ 71-76.  Specifically, the Non-Employee Directors are alleged to have "breached their fiduciary duties of loyalty by granting themselves and accepting compensation in amounts that were excessive and unfair to the Company.  *Id.* ¶ 73.  For his part, McEvoy is alleged to have "breached his fiduciary duty of loyalty by approving compensation payments to the other Defendants in amounts that were excessive and unfair to the Company."  *Id.* ¶ 74.

Only the duty of loyalty is referenced in the breach of fiduciary duty count; there are no allegations that the Directors failed to exercise due care or candor.  *See id.* ¶¶ 71-76.  This is relevant because, under 8 Del. C. § 102(b)(7), unlike breaches of the fiduciary duty of care, a director cannot be exculpated for "any breach of the director's duty of loyalty."

### C.     The Chancery Action Expressly Seeks Disgorgement

Of course, no relief is sought against Oceaneering.  The derivative plaintiff instead prays for a judgment *in favor of Oceaneering*.  Importantly, as a remedy, the plaintiff expressly sought the return of the excess payments.  Indeed, as relief for the Non-Employee Directors' "unconscionable" conduct, the derivative plaintiff seeks a judgment "[d]isgorging the excessive and unfair payments" made to the Non-Employee Directors.  Ex. A-3, ¶ 80, Prayer for Relief §

A.  Plaintiff also seeks damages against all of the Defendants for their breaches of fiduciary duty in approving the payments.  *Id.* ¶ 75, Prayer for Relief § B.

## II.    THE POLICY, COVERAGE POSITION AND PROPOSED SETTLEMENT

### A.    <u>The Insurance Program</u>

Twin City issued the Policy, formally titled "D&O Premier Defense Policy" number DA 0100989-13, to Oceaneering on a claims made basis for the Policy Period of August 1, 2013 to August 1, 2014 (the "**Policy Period**").  Ex. A-1 at Declarations Page (note bolding is used in the Policy and here to indicate a term defined in the Policy).[4]

Oceaneering is the insured and is defined as the "**Entity**" in the Policy, but its corporate officers and directors are also "**Insured Persons**".  *Id.* § II.(R) (as amended by Endorsement 8).  The Policy provides for up to $10 million in liability coverage, subject to a $0/ $500,000/ $1 million self-insured retention, depending on the Insuring Agreement that applies to the **Claim.**  *Id.* at Declarations Page.[5]

The Policy contains four Insuring Agreements designated I.(A) through (D) but only A and B are potentially relevant here.  Insuring Agreements I.(A-B) (as amended by Endorsement 10) provide in relevant part:

This Policy affords the following coverages:

---

[4] Because it was written on a "claims made" basis, not on an occurrence basis, the Policy covers claims that are first made during the **Policy Period** even if the underlying events giving rise to the claim occurred prior to the **Policy Period**.  Thus, although the directors' compensation decisions were made prior to the Policy's inception, because the Chancery Action was filed on June 14, 2014, during the **Policy Period**, the **Claim** was first made under the Policy.

[5] Oceaneering purchased additional insurance policies that provide coverage excess of Twin City's Policy.  Excess insurance is normally insurance that only applies once the primary and other underlying policy coverage is exhausted by the actual payment of loss thereunder.  *Ali v. Federal Insurance Co.*, 719 F.3d 83, 90-91 (2d Cir. 2013).  In this case, just like Twin City, the excess carrier has explained that any settlement in the nature of disgorgement is uninsured.

**(A)  NON-INDEMNIFIABLE DIRECTORS' AND OFFICERS' LIABILITY**

Except for **Loss** which the Insurer pays pursuant to Insuring Agreement (B) of this Policy, the Insurer will pay **Loss** on behalf of the **Insured Persons** which the **Insured Persons** have become legally obligated to pay as a result of a **Claim first** made during the **Policy Period** . . . against the **Insured Persons** for a **Wrongful Act**. . . .

\* \* \*

**(B)  INDEMNIFIABLE DIRECTORS' AND OFFICERS' LIABILITY**

The Insurer will pay **Loss** on behalf of the **Entity** for which the **Entity** has, to the extent permitted or required, indemnified the **Insured Persons,** and which the **Insured Persons** have become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** . . . ., against the **Insured Persons** for a **Wrongful Act** . . . .

Ex. A-1, §§ 1.(A)-(B).

Insuring Agreement C (not quoted) provides that Twin City "will pay **Loss** on behalf of the **Entity** which the **Entity** has become legally obligated to pay as a result of a **Securities Claim** . . . , against the **Entity** for a **Wrongful Act** . . . ." *Id.* § 1.(C).  Thus, by its terms, Insuring Agreement C applies only to the corporation's own liability.  Because, here, the Chancery Action seeks relief on behalf of the corporation, not against it, that provision cannot apply to settlement payments.[6]

Insuring Agreement B applies "to the extent [Oceaneering is] permitted or required [to] indemnif[y] the **Insured** Persons." *Id.* § 1.(B).  Because Oceaneering is incorporated in Delaware, its ability to indemnify its directors is a function of Delaware business corporations law.  While Delaware generally allows for broad indemnification of corporate directors, in this case, because the suit is derivative, the corporation is only permitted to indemnify directors for

---

[6] Similarly Insuring Agreement D is irrelevant.  It applies to only investigative costs, which are not in issue here.  *See id.* § I.(D).

"expenses (including attorneys' fees) actually and reasonably incurred."  8 Del. C. § 145(b). Insuring Agreement B (quoted) is, therefore, relevant because under Delaware law, the company can indemnify (and in this case is indemnifying) the Directors for the costs of their defense, *i.e*, their attorneys' fees.

On the other hand, the corporate indemnification statute does **not** authorize reimbursement of settlements paid or judgments in derivative actions.  *In re Massey Energy Co*., 2011 WL 2176479, at *16 (Del. Ch. May 31, 2011).  Although Insuring Agreement B may provide coverage for defense fees (once the applicable $1 million self-insured retention is exhausted), any coverage that might exist for the costs of settling the Chancery Action must exist, if at all, under Insuring Agreement A (quoted above).

Central to this case -- even assuming that all of the many other conditions are met, and no other exclusion or limitation applies -- Insuring Agreement A only provides coverage for payments that constitute "**Loss**" as defined by the Policy.  Specifically it says Twin City will "pay **Loss** on behalf of the **Insured Persons** which the **Insured Persons** have become legally obligated to pay. . . ."  *Id.* § 1.(A).

**Loss** is defined at Section II.(U) (as amended by Endorsement 10) of the Twin City Policy.  It provides in relevant part: "**'Loss'** means **Damages, Defense Costs** and **Investigation Costs**."

"**Damages**," in turn, is defined as "amounts, other than **Defense Costs** . . . ., which the **Insured Persons** . . . are legally obligated to pay . . . . including: (1) settlements, judgments, and costs, awarded pursuant to judgments, and appeals."  *Id.* § II.(C) (as amended by Endorsement 10).  Although that first portion of the "**Damages**" definition includes "**Settlements**," the definition of **Damages** goes on to provide that "'**Damages**' shall not include" the following:

(i)     taxes, fines or penalties other than, where permissible by law and otherwise covered under this Policy;

(ii)    non-monetary relief; . . . .

(iv)    amounts for matters uninsurable pursuant to applicable law; and . . . .

Notably, the forgoing is not an exclusion from coverage.  It does not take away coverage that otherwise was granted by the insuring agreements.  Rather, payments that fall within the list are *by definition* not **Damages** and, in turn, not within the definition of **Loss**, which, as noted above, is a required element in order for there to be coverage under Insuring Agreement A.

**B.**    **The Initial Coverage Position and Reservation of Rights**

Oceaneering gave notice of the Chancery Action as a Claim under the Twin City Policy on June 17, 2014.  Ex. A-2.  By letters dated June 23, 2014 and October 6, 2014 Twin City acknowledged the Claim.  Exs. A-4 and A-5.

In its October letter, Twin City wrote, "[s]ubject to the reservation of rights articulated below, it appears that coverage for this matter is triggered under Insuring Agreements (B) and (C) [quoted above]."  Ex. A-5 at 3.  That statement, however, was limited by a reservation of rights, and by the terms, limits and conditions of the Policy.  Moreover, it only recognized coverage under Agreement B for the indemnifiable costs of the Directors' costs of defense (once the retention was satisfied) as well as Oceaneering's own costs (under Insuring Agreement C) for participating in the Chancery Action as a nominal defendant.  Nowhere did it indicate that there was or would be coverage under Insuring Agreement A for the costs of settling the Chancery Action by way of disgorgement.  Nor could it, as at that juncture there was no contemplated settlement to consider.

Notably, the fact that a **Claim** may trigger some part of coverage under a Policy – such as defense costs – does not mean that every payment as a result of that Claim is covered.  To the

contrary, while the cost of defending an action may be covered based on the allegations of the complaint, that does not mean the costs of resolving that action (in whole or part) will necessarily be within the coverage.

The October reservation of rights letter rightly recognized that the duty to fund the defense of the action is broader than coverage for the ultimate liability.  Twin City, therefore, consented to the retention of defense counsel for whom it would, subject to applicable retentions (deductible), pay the defense costs on a current basis[7].  The letter explained:

> Twin City does not have a duty to defend the Action. . . .  We understand the Company has retained David Sterling of Baker Botts and Mark Hurd of Morris Nichols.  As you know, Twin City has consented to such retentions and asks that defense counsel continue to comply with the revised version of The Hartford's Litigation Management Guidelines, to which we consented on July 29, 2014.

Ex. A-5 at 8.

However, it made clear that approving the defense of the action does not mean that the cost of resolving the action would be covered.  To the contrary, the letter explained:

> We expressly reserve all rights under the Twin City Policy, at law and/or in equity, to deny any coverage and/or rescind the Policy on additional and alternative bases as other terms, conditions, exclusions, endorsements and provisions of the Policy, including representations, warranties, statements, declarations and omissions in connection with the application therefore, are found to be applicable. . . . As is customary, Twin City reserves all rights available to it under the Twin City Policy, at law, and/or in equity.

*Id.* at 9.

### C.    The Proposed Settlement

The plaintiff in the Chancery Action has demanded in settlement that the Directors return a portion of their compensation to Oceaneering.  Because of the confidential nature of such

---

[7] The Policy also requires Twin City to advance defense expenses in Section VI.(B), which provides:  "Upon written request by any **Insured,** the Insurer shall advance **Defense Costs** in excess of the applicable **Retention** amount, in defense of any **Claim** covered by this Policy."

settlement communications it would be inappropriate to go into detail here as to the negotiations. However, Twin City is filing a motion under seal concerning the Sealed Supplemental Declaration of Anthony Fowler ("Fowler Sup. Dec.") so that the Court can see the communications.  Moreover if, after reviewing defendants' brief, it appears that there is any dispute as to the nature of any settlement payments to Oceaneering, Twin City will move to serve a short sealed addendum to its responsive brief detailing how specifics of the settlement negotiations make clear that any monetary settlement of the Chancery Action, pursuant to which repayment is made to Oceaneering, necessarily will be in the nature of disgorgement.  However, even without going into specifics, it is entirely clear that the proposed settlement involves the disgorgement of a portion of the directors' compensation.

As documented in the sealed declaration, on September 25, 2015, the plaintiff in the Chancery Action made a settlement demand.  According to the summary of the settlement demand prepared by Oceaneering (Ex. B-2), it is plain that the plaintiff demanded that Non-Employee Directors disgorge and return the compensation that they received from Oceaneering. Moreover, the requested settlement is expressly justified and allocated based upon a formulaic calculation employing, *inter alia*, the amount of the Non-Employee Directors' compensation (discussed in Factual Background section I.A above).[8]

Defendants responded with a counter-offer on January 28, 2016.  A true and correct copy of the Counter-Offer is attached as Exhibit B-3.  Again without going into the details in this public document, the Non-Employee Directors offered, in the counter-offer, to return some portion of their compensation in order to settle any and all claims of liability against them.  *Id*. Twin City understands that settlement negotiations are ongoing.  *See* Ex. B-10.

---

[8] The Court will be able to see for itself from the sealed documents the treatment of the one employee-director, McEvoy (Oceaneering's CEO and a director), who allegedly breached his fiduciary duties to the Company when he voted, along with the rest of the board, to approve the compensation payments to the other defendants.

What is clear from these demands is that the amount sought and the amount offered are both based on the compensation paid to the Non-Employee Directors and both involve the Directors returning a portion (but not all) of the compensation they received *from Oceaneering* back *to Oceaneering* — disgorgement, plain and simple.

**D.     The Directors' Demand for Twin City
to Commit to Funding a Settlement**

After receiving a copy of the settlement demand, Twin City sent an email supplementing Twin City's earlier October 6, 2014 reservation of rights to Oceaneering's broker.  Ex. B-4.  That November 10 email states that Twin City continues to recognize its "obligation to reimburse Defense Costs following satisfaction of the $1M retention," but states that "Damages do not include amounts for matters uninsurable pursuant to applicable law, including the contemplated settlement of the *Jacobs* derivative [Chancery] action."  *Id.*  The November 10 email went on to indicate that the proposed settlement is uninsurable because it constitutes "disgorgement of a portion of the individual defendants'" compensation.  *Id.*

Oceaneering's broker responded by email on December 2, 2015.  Ex. B-5.  That email, however, does not even address the question of whether the contemplated settlement of the Chancery Action would be in the nature of uninsured disgorgement.  Instead, the email knocks down a stalking horse.  It asserts that an exclusion to coverage, contained in Section V.(D) of the Policy (as amended by Endorsement 10), does not bar coverage.  *Id.*  Twin City, however, is not relying on that exclusion, so its applicability (or inapplicability) is entirely irrelevant.  An exclusion can never act to create coverage that is not granted by the insuring agreements of a policy.

Twin City responded, making that exact point, on December 31, 2015 (the "December 31 Letter").  Ex. B-6.  The December 31 Letter makes clear that Twin City's position is that its

"determination that the proposed settlement does not qualify for coverage is not predicated at all on the personal profit exclusion, but rather is because the proposed settlement is uninsurable as a matter of law and is therefore, excluded from the definition of covered Damages by Section II.(C)(iv) of the Twin City Policy (Damages 'shall not include . . . amounts for matters uninsurable pursuant to applicable law.')."  Ex. B-6 at 1.

The December 31 letter includes an analysis of case law holding that "the restitution or disgorgement of improper payments is uninsurable and does not constitute 'loss' under insurance policies."  *Id.* at 2.  This letter also explains that the relief provided by the proposed settlement of the Chancery Action is in the nature of disgorgement because the settlement demand requires the return of "allegedly excessive salary and associated payments."  *Id.*

Oceaneering's broker responded on January 14, 2016, taking the position that there is no Texas case law holding that restitution or disgorgement of improper payments is uninsurable and that, even if it is, a final adjudication is required to determine that a settlement constitutes restitution or disgorgement.  Ex. B-7 at 2-3.

In the last installment in this series of coverage correspondence, Twin City made clear its belief that under settled law settlements in the nature of disgorgement are uninsurable.  Ex. B-9 at 1.  This letter also distinguished the cases cited in the broker's January letter.  *Id.* at 2-3.

 Notably, as explained in subpart F below, Twin City has never taken the position that no aspects of any potential settlement could ever possibly be covered.  Nevertheless, after the foregoing correspondence it had become clear to Twin City that the Directors were asking Twin City to ignore the law and provide coverage for repayments from them ***to Oceaneering.***  Plainly such repayment is a key aspect of the settlement discussions outlined by the sealed documentary evidence and likely any eventual settlement.

17

E.    **The Issue Presented in this Action**

Based on the tone and tenor of the correspondence, Twin City recognized at that point that there is a ripe dispute as to whether or not a settlement payment, to the extent that it is in the nature of disgorgement, would be insured under the Twin City Policy, applicable law and public policy.   In order to resolve that dispute, and to foreclose any claim that it was wrongfully refusing to participate in settlement discussions of the Chancery Action, Twin City instituted this declaratory judgment action seeking a declaration as to that single issue.   *See* ECF Doc. 1 (Coverage Complaint) ¶¶ 58-60.

F.    **What is *NOT* in dispute**

While there exists the potential for other, distinct issues to arise under the Policy regarding the Chancery Action claim, such issues are unlikely to be disputed, are not ripe and thus are ***not*** at issue in this case.   In this regard, Twin City has never taken the position that no part of a settlement could ever be covered; only any payment of compensation paid by Oceaneering being returned to Oceaneering is disgorgement and, therefore, not covered.

Thus, as pointed out above, the obligation of Twin City to provide funding for the defense of the Chancery Action is ***not*** in issue in this case.   Not only has Twin City not denied coverage for defense expenses, it has affirmatively offered contemporaneous advancement of **Defense Costs** under Insuring Agreement B once the applicable self-insured retention is exhausted.

Similarly, if and to the extent a settlement of the Chancery Action involves an award of fees to the plaintiff's counsel in that case, whether or not such award would constitute **Damages** under the Policy is ***not*** before this Court.   Twin City has not been asked to fund such payment and has not denied coverage for such a payment.   When and if that issue develops it will be addressed by the parties, but is not part of this suit.

18

Third, by the same token, the amount and reasonableness of an ultimate settlement of the Chancery Action is **not** relevant to this proceeding.  Whether a settlement can be reached at the current levels or would require additional amounts does not affect the legal issue.[9]

Finally, the potential allocation of some portion of the settlement to McEvoy is also not in issue.  While, given the facts, such an allocation would be very low, the Policy specifically provides a mechanism for resolving any disagreement as to allocation.  Ex. A-1, § VI.(B).

At bottom, the to and fro of the settlement talks and the language of any ultimate agreement are irrelevant to the legal issue presented by this motion.  The law is settled that whether or not a settlement is in the nature of disgorgement is determined by the claims asserted, relief sought and nature of the payments, not the parties' characterization of the payments or the labels they attach in the settlement papers.[10]

---

[9]   In most cases where there is a dispute as to the scope and availability of Directors and Officers insurance coverage, the carrier and insureds reserve their rights (as they have done here) and the corporation funds whatever settlement is reached and the issue of insurance coverage for that settlement can be litigated, if necessary, after the fact.  Under Section X.(B) of the Policy (as amended by Endorsement 10), the insurer has the right to consent to a settlement.  However, in such situations the insurer frequently waives its consent rights.  Indeed, in this case, by email dated January 28, 2016, Twin City did exactly that; at the request of Oceaneering's insurance broker, Twin City agreed that the Directors could make a settlement counter-offer in the amount specified in the request and that (subject to certain specified conditions) Twin City would not assert the lack of its consent to such settlement as a defense to coverage.  Ex. B-8.  Thus, Twin City's consent rights are also **not** in issue.

[10]   Any attempt by the Directors to "structure-around" disgorgement law would be in bad faith and ineffectual.  The language and terms of the ultimate settlement agreement are irrelevant.  In this regard, *CNL Hotels & Resorts, Inc. v. Twin City*, 291 Fed. Appx. 220, 224 (11th Cir. 2008), is instructive where the Eleventh Circuit explained that "CNL also contends that the payment to the Purchaser Class was not restitutionary because the settlement agreement states that the payment was 'not restitution or disgorgement.'"  Despite this obvious attempt to write around disgorgement law, the Eleventh Circuit brushed aside the arguments saying, "[t]he agreement between CNL and the Purchaser Class is not binding on any third party [*i.e.,* the insurance company]."  *Id.*  In any event, "we agree with the district court that this argument is 'too lacking in merit to warrant discussion.'"  *Id.*

<u>**A**RGUMENT</u>

**I.   THE POLICY DOES NOT PROVIDE COVERAGE
      FOR SETTLEMENT BECAUSE THE SETTLEMENT
      CONSTITUTES DISGORGEMENT**

   **A.   <u>The Policy Does Not Provide Coverage for Disgorgement</u>**

It has long been the law that insurance simply does not and cannot cover the return of money or property to its rightful owner.  Courts in almost every jurisdiction that has squarely addressed the issue agree that payments of judgments or settlements in the nature of disgorgement are not insurable.  Those courts reject insurance coverage for disgorgement because paying a restitutionary remedy cannot cause any injury to the insured, and therefore can never be a "Loss."

In *In re TransTexas Gas Corp.*, 597 F.3d 298 (5th Cir. 2010), the Fifth Circuit was confronted with a fact pattern not very different from the one at bar.  There, TransTexas was in some financial distress and decided to sever its CEO pursuant to a severance agreement, paying him millions of dollars.  Creditors sought the return of the severance payment, but also argued that the Directors and Officer's insurance policy should cover the former CEO's repayment obligation.  Judge Atlas of this Court held that no coverage was provided for the repayment of the severance because it was restitutionary in nature.  *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. U.S. Bank, Nat. Ass'n*, 2008 WL 2405975, at *5 (S.D. Tex. June 11, 2008).

The Fifth Circuit affirmed.  It held that the CEO "suffered a loss in the colloquial sense" but that the critical issue was whether the repayments "constitute an insurable 'Loss' under the Policy."  597 F.3d at 309.  It then quoted the definition in issue there which, very much like the Policy here, provided that:

"Loss" means damages, settlements, judgments (including pre/post-judgement interest on a covered judgment), Defense Cost and Crisis Loss; however, **"Loss" (other than Defense Costs) shall not include ... (6) matters which may be deemed uninsurable under the law** pursuant to which this policy shall be construed.

597 F.3d at 309 (emphasis added).

In affirming this District Court's holding that no coverage is provided for the disgorgement, the Fifth Circuit expressly agreed, under Texas law, with the holding in the leading Seventh Circuit case, called *Level 3*, "that the 'insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return.'" *Id.* at 310 (quoting *Level 3 Commc'ns, Inc. v. Federal Ins. Co.*, 272 F.3d 908, 910-11 (7th Cir. 2001)).[11]

In *Level 3*, Judge Posner explained that "loss," within the meaning of an insurance policy can never include the "restoration of an ill-gotten gain." 272 F.3d at 910. In *Level 3*, the insured entered a settlement to resolve a securities action, in which the settlement proceeds were distributed to the shareholder class based upon the difference between the inflated price they paid for the stock and the stock's alleged actual value. *Id.*

Despite the fact that the *Level 3* policy defined "loss" as the "total amount which any Insured Person becomes legally obligated to pay including, but not limited to settlements," the Seventh Circuit held that the insured was not entitled to coverage because the settlement was restitutionary, and thus not a "loss" within the meaning of the policy. *Id.* at 909-11. The Seventh Circuit explained that if the law allowed an insured to receive coverage for payments to return money, the result would be a windfall to the insured. *Id.* at 911.

---

[11] *Cf., Burks v. XL Specialty Ins. Co.*, 2015 WL 6949610, at *10 (Tex. App. – Houston [14th Dist.] Nov. 10, 2015, no pet.) (disagreeing with the *TransTexas* court's reading of *Nortex Oil & Gas Corp. v. Harbor Ins. Co.*, 456 S.W.2d 489, 493-94 (Tex. App. – Dallas 1970, no writ)). This case is discussed extensively in a separate section at Argument section I.C., *infra*.

Significantly, the Seventh Circuit also rejected the insureds' argument that a judicial determination of fraud was required to find that the settlement was not a covered loss.  *Id.* Instead, the Seventh Circuit held that regardless of whether the payment was the result of a settlement or a judgment, the insureds were required to disgorge profits that were allegedly improperly obtained.  The Seventh Circuit observed that the insured there was arguing that "[a]s long as the case is settled before entry of judgment, the insured is covered regardless of the nature of the claim against it.  *Id.* Rejecting that argument the court said: "That can't be right." *Id.*

The Fifth and Seventh Circuit are hardly alone in their view that payments of restitution are not covered by insurance.  Indeed, one of the leading treatises on insurance law points out that it is "a black-letter concept of insurance law that insurance does not include the restoration of an ill-gotten gain."  4-28 NEW APPLEMAN ON INSURANCE LAW LIBERTY EDITION § 28.04(3)(c) (citing *Level 3*); *see also* 2-24 LIABILITY OF CORPORATE OFFICERS AND DIRECTORS § 24.07, at 24-36 (noting generally that "an insurer is not obligated to pay as loss any disgorgement, restitution or other types of improper gain as a matter of law").

In *Nortex*, the Dallas Court of Appeals confronted a situation where one oil driller drew oil diagonally from beneath property to which it had no rights.  456 S.W.2d 489.  When Nortex settled the claims by paying for the oil, the court held:

> An insured (under such a policy as we have here) does not sustain a covered loss by restoring to its rightful owners that which the insured, having no right thereto, has inadvertently acquired. (The insured's innocence and good faith are immaterial.)  The insurer did not contract to indemnify the insured for disgorging that to which it was not entitled in the first place, or for being deprived of profits to which it was not entitled.

*Id.* at 493-94.

Other Texas authority is in accord.  In *John M. O'Quinn P.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 33 F. Supp. 3d 756, 771 (S.D. Tex. 2014), for example, this Court was confronted with a claim by a law firm that had deducted litigation expenses from its clients' product liability recoveries that were not authorized by the attorney retention agreements.  The Court concluded that the firm's obligation to return the money was not "Loss" under the applicable policy.  *Id*; s*ee also Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.*, 1993 WL 566032, at \*7 (S.D. Tex. Oct. 8, 1993), *aff'd*, 76 F.3d 89 (5th Cir. 1996).

Moreover, an overwhelming number of courts from other jurisdictions agree that the return of money is a restitutionary remedy and cannot be an insurable loss.  For example, in another leading case, *Reliance Group Holdings. Inc. v. Nat'l Union Fire Ins. Co.*, 594 N.Y.S.2d 20, 24 (N.Y. App. Div. 1993), the New York court held: "'It is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired.'"  *Id.* (quoting *Bank of the West v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992)).  Only a few weeks ago, the Second Circuit reiterated in *U.S. Fid. & Guar. Co. v. Fendi Adele S.R.L.*, __ F.3d ___, 2016 WL 2865578, at \*5 (2d Cir. May 17, 2016) that an insured "could not have reasonably expected that it would be indemnified for disgorgement damages."  *See also Vigilant Ins. Co. v. Credit Suisse First Boston Corp.,* 782 N.Y.S.2d 19, 20 (1st Dep't 2004) ("The risk of being directed to return improperly acquired funds is not insurable.  Restitution of ill-gotten funds does not constitute 'damages' or a 'loss' as those terms are used in insurance policies."); *J.P. Morgan Securities Inc. v. Vigilant Ins. Co.*, 992 N.E.2d 1076, 1082-83 (N.Y. 2013) (acknowledging that disgorgement is uninsurable as a matter of law).

Other jurisdictions have reached the exact same result:  <u>California</u>: *Bank of the West*, 833 P.2d at 553 ("one may not insure against the risk of being ordered to return money"); *Big 5 Corp.*

*v. Gulf Underwriters Ins. Co.*, 2003 WL 22127029, at *4 (C.D. Cal. July 14, 2003) ("Damages within the meaning of an insurance contract do not include the restoration of an ill-gotten gain."), *aff'd*, 2005 WL 1529709 (9th Cir. June 30, 2005); *Republic Western Ins. Co. v. Spierer, Woodward, Willens, Denis & Furstman*, 68 F.3d 347, 351-52 (9th Cir.1995) (finding that restitutionary payments are not "damages"); analyzing both <u>Florida</u> and <u>New York</u> law: *CNL Hotels*, 291 Fed.Appx. at 223 ("Because we conclude that the payment to the [underlying plaintiffs] was restitutionary in nature, the payment was not a loss covered by the [insurance] policy."); <u>Illinois</u>: *Ryerson Inc. v. Federal Ins. Co.*, 676 F.3d 610, 613 (7th Cir. 2012) (explaining that restitutionary settlement payments are not "loss" within the meaning of insurance); <u>Hawaii</u>: *Executive Risk Indem., Inc. v. Pac. Ed. Servs., Inc.*, 451 F.Supp.2d 1147, 1161-62 (D. Haw. 2006) (adopting rule that restitutionary settlements are uninsurable under Hawaii law and noting that "[o]ther jurisdictions agree with California courts in holding restitution uninsurable"); <u>Indiana</u>: *Conseco, Inc. v. Nat'l Union Fire Ins. Co.*, 2002 WL 31961447, at *6 (Ind. Cir. Ct. Dec. 31, 2002) ("It is axiomatic that insurance cannot be used to pay an insured for amounts an insured wrongfully acquires and is forced to return . . .."); <u>Pennsylvania</u>: *Cent. Dauphin Sch. Dist. v. Am. Cas. Co.*, 426 A.2d 94, 97-98 (Pa. 1981) (repayment of money is uninsurable under Pennsylvania law); *Mountainside Holdings, LLC v. Am. Dynasty Surplus Lines Ins. Co.*, 2014 WL 3055881, at *10-11 (Pa. Com. Pl. June 30, 2014), *aff'd*, 2014 WL 10047052 (Pa. Super. Ct. June 25, 2014) (no coverage for settlement because "it is well settled that as a matter of public policy insurance cannot, as a matter of law, cover disgorgement").

Because the repayment is uninsurable as a matter of law, the language of the Policy precluding coverage for such matters is arguably superfluous.  No matter what the Policy says,

insurance cannot cover disgorgement.  Here, however, the Policy clearly incorporates this body of law by reference because it defines the Loss to exclude "amounts for matters uninsurable pursuant to applicable law."  Ex. A-1, § II.(C) (as amended by Endorsement 10).

### B.   No Wrongdoing Need be Established

Based on the communication with the Directors, their main response to date has been to assert that Twin City is subject to a Catch-22.  The Directors claim that in order to prove the settlement of the Chancery Action is uninsurable disgorgement, Twin City must prove that the Directors did something wrong.  The Directors simultaneously assert that because payment would be the result of a settlement, Twin City is precluded from proving they did anything wrong.

In so doing, they are advancing precisely the same argument rejected in *Level 3* when Judge Posner noted the insured's argument that "[a]s long as the case is settled before entry of judgment, the insured is covered regardless of the nature of the claim against it."  272 F.3d at 911.  As noted above, the Court rejected the argument explaining:

> That can't be right. It would mean, as Level 3's lawyer confirmed at argument, that if Level 3, seeing the handwriting on the wall, had agreed to pay the plaintiffs in the fraud suit all they were asking for (a very large amount-almost $70 million), which they surely would not have done had there been no evidence of fraud (no rational defendant settles a nuisance suit for the full amount demanded in the complaint, unless the amount is trivial), [the insurance company] would still be obligated to reimburse Level 3 for that amount. And that would enable Level 3 to retain the profit it had made from a fraud. In fact Level 3 settled with the plaintiffs in the fraud suit for the not inconsiderable amount of $12 million after the trial had begun and much of the expense of defending the suit had therefore already been incurred. It is not surprising, therefore, that Level 3 has made no attempt to show that the fraud suit was groundless and the settlement merely an effort to avoid the expense of defending a nuisance suit.

272 F.3d at 911-12.  Level 3 did recognize that there might be circumstances where a settlement of a suit seeking restitution might be insurable if the underlying suit was "groundless" and the

amounts paid were "trivial."   *Id.*   But, based on its conclusion that the settlement was not "nuisance" value, the *Level 3* court granted a judgment of no courage to the insurer.

Indeed many courts have made clear, whether there is any wrongdoing by the insured is entirely irrelevant to the issue of whether the remedy is uninsurable disgorgement.   In determining whether a settlement is uninsurable, it is "immaterial whether [the insured] committed fraud" if the insured received money directly from the underlying plaintiffs and "returned some of the money after the [underlying plaintiffs] alleged that . . . [the insured] violated the law."   *CNL Hotels & Resorts*, 291 Fed. Appx. at 223; *see Conseco*, 2002 WL 31961447, at *11; *see also Southcentral Employment Corp. v. Birmingham Fire Ins. Co.*, 926 A.2d 977, 982 n.2 (Pa. Super Ct. 2007) (explaining that the general proposition from *Conseco* is correct that "even where inadvertently acquired, money or property that has to be returned does not belong to the insured and therefore the insured has not suffered a loss.   Otherwise the insured would be unjustly enriched with a windfall from its own wrongful, albeit innocent, conduct").

Rather, to establish disgorgement, what matters is that it was *alleged* the Directors were required to disgorge and the settlement involves a payment in the nature of restitution, *i.e.,* to give back what was alleged to have been received (or taken).   Many of the cases finding that restitutionary payments are not "loss" for insurance purposes are the result of settlements with no judicial finding that the returned funds were ill-gotten.   *See, e.g., Ryerson Inc.*, 676 F.3d at 612-14 (holding that **settlement** was not insurable because it represented "a return of part or maybe all of the profit" that the insured had allegedly improperly acquired); *Aon Corp. v Certain Underwriters at Lloyd's of London,* No. 06-16852 (Ill. Civ. Ct. Ch. Div. Dec. 3, 2010),  slip op. at 22-29 (holding that **settlement** was not insurable because the plaintiffs in the underlying suit sought to recover amounts allegedly wrongfully collected); *Conseco*, 2002 WL 31961447, at *11

26

(*settlement* was uninsurable even without holding that the proceeds to the insured were "ill-gotten" because the measure of damages was limited to the gain of the insured); *Mountainside Holdings,* 2014 WL 3055881, at *10 (holding False Claims Act **settlement** of Medicare overbilling was uninsurable because "it is well settled that as a matter of public policy insurance cannot, as a matter of law, cover disgorgement"); *Big 5 Corp.*, 2003 WL 22127029, at *4 (holding that **settlement** was not insurable because the plaintiffs sought to recover allegedly wrongfully withheld wages); *Level 3*, 272 F.3d at 910-11 (because the payment was "restitutionary in character," the **settlement** was uninsurable); *see also Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 320 (3d. Cir. 1995) (explaining in dicta that the principle that disgorgement is uninsurable under the law applies where insured **settles** an underlying suit).

Any payment to Oceaneering in settlement of the Chancery Action certainly fits squarely within this law.

### C.    Burks is Inapposite

Principally, if the prior correspondence is to be the guide, the Directors hang their case almost entirely upon *Burks*, 2015 WL 6949610 (Tex. App. – Houston [14th Dist.] Nov. 10, 2015, no pet.).  In essence, they assert that *Burks* wipes away decades of jurisprudence.  In so doing, they are reading that decision far too broadly.[12]

---

[12] Ultimately, all Burks really held was that assuming that the settlement of the underlying action was uninsurable disgorgement, the insurer there "has not established that this D&O policy excludes the advancement of expenses incurred for defending against such claims."  In other words it just said that the payment of *defense expenses* was not disgorgement.  *Id.* at *8.  Of course, in Texas, as in most states, the duty to pay for defense fees is broader that the duty to pay indemnity liability so that holding is hardly remarkable.  *See, e.g.*, *State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 889 (Tex. App. – Dallas 2001, pet. denied); *E & L Chipping Co. v. Hanover Ins. Co.*, 962 S.W.2d 272, 274 (Tex. App. – Beaumont 1998, no pet.).  Thus, *Burks* is irrelevant because, as discussed above, Twin City, like the *Burks* court, recognizes that advancement of **Defense Costs** presents a different issue.  Twin City has not denied its obligation to fund the defense, once the self-insured retention is met.

In fact, that court did not reach any definitive holding.  In Footnote 5, the *Burks* decision indicates explicitly that the court was not reaching the issue of the insurability of disgorgement saying, "we render no opinion on the matter" but then saying, "[w]e assume without deciding that disgorgement is 'uninsurable' in Texas."  *Id.* at *6 n.5.  The court then concluded: "We discern a genuine issue of material fact on whether Burks's settlement was for disgorgement and therefore 'uninsurable under the law' of Texas."  *Id.* at *10.  Notably, the quoted language from the conclusion strongly suggests, if the settlement is, in fact, in the nature of disgorgement it would "therefore [be] uninsurable under the law of Texas."  *See id.* at *8.[13]

One might read *Burks* for the proposition that there could be disputed facts as to the essential nature of whether whatever settlement is finally reached in the Chancery Action is disgorgement.  In other words, the *Burks* court, much like the New York Court of Appeals in *J.P. Morgan Sec. Inc.*, 992 N.E.2d at 1082-83, held that whether or not a settlement is, in fact, in the nature of disgorgement is a factual question.  But here the claim and relief sought are so narrow and so clearly seeking a remedy in the nature of disgorgement that under the applicable summary judgment standard any settlement is necessarily restitutionary and, therefore, uncovered.  Indeed, unlike the case in *Burks*, where the court had no evidence as to the nature of the settlement, 2015 WL 6949610, at *8, here the detailed documentary evidence filed under seal shows precisely that the contemplated settlement is disgorgement.

Moreover, given the focus of the complaint, any potential settlement that involved payments to Oceaneering necessarily must be primarily if not entirely uninsured disgorgement.

---

[13] The Directors also attempt to use *Burks* to bootstrap in the much criticized decision in *U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*, 2014 WL 3012969 (D. Minn. July 3, 2014).  Unlike *TransTexas*, that case is not a binding authority.  In any event, a careful reading of *Burks* shows that while citing *US Bank* on some issues, the holding actually rejects the *US Bank* analysis in that it remanded for a factual determination as to the nature of the settlement, saying "Burks has raised a fact issue on the nature of the settlement."  2015 WL 6949610, at *10.  In this respect, the *Burks* decision plainly rejects the *US Bank* analysis.  *See U.S. Bank Nat'l Ass'n*, 2014 WL 3012969, at *4.

In any event, any factual dispute as to the essential nature of a settlement is not before this Court nor could it be as there is no final settlement.  Instead, the issue is the legal question which was assumed "without deciding" by *Burks*, *i.e.*, are payments in the nature of disgorgement uninsurable.

In this regard, in the settlement communications between Twin City and the Directors, the Directors have asserted that *Burks* rejected *Level* 3.  To the contrary, the only fair reading of *Burks* is that it distinguished and harmonized *Level 3*, not rejected it, saying that the:

> Seventh Circuit acknowledged that not all settlements in satisfaction of claims alleging ill-gotten gains necessarily would be excluded from coverage. It refused to decide and could find "no guidance" on whether an insured might argue that such a settlement could be covered with a showing that the third-party's allegations were groundless.  Here, unlike in *Level 3*, Burks has raised a fact issue on the nature of the settlement. . . .

2015 WL 6949610, at *10 (citations omitted).

The *Burks* Court's observations regarding *Level 3* are entirely fair.  As noted earlier, the *Level 3* court recognized the possibility that a settlement of a claim seeking disgorgement might be insurable if the claim was "groundless" and/or the amount was trivial.  272 F.3d at 911-12. But based on the amounts being offered (*see* Exs. B-1 at 1-2, B-3 at 7), it is hard to think the Directors are claiming the amount is trivial and the allegation of the Chancery Action **Verified** Complaint, discussed above, do not support any suggestion that   the derivative action is "groundless."

In any event, the issues that led the *Burks* court to question summary judgment were neither groundlessness nor triviality of amount.  Instead the court there noted that the relief sought was broader than just disgorgement, saying, "the plan agent sought more than merely disgorgement or restitution; the plan agent sough[t] a 'money judgment' and 'attorney's fees.'" 2015 WL 6949610, at *8.   Therefore, "[g]iven that Burks settled these claims, there is

necessarily a fact issue about whether the entire settlement amount represented disgorgement of ill-gotten gains." *Id.*

Again, here there are no such factual issues. Unlike *Burks*, Twin City has not denied that it must pay defense costs once the retention is met. Moreover, as discussed in section II.F. of the Factual Background section, *supra*, the issue of a fee award to the plaintiff is not in dispute in this suit. And, at bottom, given the nature of the claims, any settlement necessarily must be in the nature of disgorgement and, therefore, uninsured.

### D.     The Underlying Rationale for the Rule is Well-Rooted in Texas Law

While insurance policies are contracts, they are specialized because the law long ago established principles to assure that policies only serve to spread the risk by reimbursing loss. Policies, however, cannot result in gain or even act as inducement to wrongdoing. Thus, insurance law prevents policies from, for example, covering the life on an unrelated person or insuring a home for more than it is worth. Otherwise the policyholder may wish someone dead, or be incentivized to strike a match.

Those same principles lead to the long line of cases from many jurisdictions, discussed above, holding that when a party disgorges gain, that disgorgement is never, as a matter of law – regardless of the terms of the contract – insured Loss.

Some courts have reached the conclusion that disgorgement remedies are uninsurable because otherwise the insured party required to return that which is not his would be unjustly enriched by an insurance recovery. *See, e.g., Conseco*, 2002 WL 31961447, at \*6 (insured would be unjustly enriched if amounts it wrongly acquired and returned were indemnified); *Reliance Group Holdings*, 594 N.Y.S.2d at 25 (a settlement requiring disgorgement is an agreement that the defendant "had been unjustly enriched" to at least the extent of the repayment). *See also, e.g., Fidelity Bank v. Chartis Specialty Ins. Co.*, 2013 WL 4039414, at \*3

(N.D. Ga. Aug. 7, 2013) ("To require [the insurer] to pay restitution for amounts [the insured bank] collected pursuant to illegal practices would result in a windfall to [the bank]).

Texas law has, of course, long recognized that an insured should not be unjustly enriched via an insurance contract. *E.g.*, *Crisp v. Sec. Nat. Ins. Co.*, 369 S.W.2d 326, 328 (Tex. 1963) (the objective of insurance "being that the insured should neither reap economic gain nor incur a loss"); *Coats v. Farmers Ins. Exch.*, 230 S.W.3d 215, 219 (Tex. App. – Houston [14th Dist.] 2006, no pet.) (same); *see also Camden Fire Ins. Ass'n v. Sutherland*, 284 S.W. 927, 930 (Tex. Comm'n App. 1926) ("It has never been the policy of our courts to permit any one to profit by a fire."). The decision in *Nortex*, 456 S.W.2d at 492-94, is in line with this well-grounded reasoning as well.

Other courts phrase the same rule as an "interpretive principle" holding that as a matter of law *always* inherent in the word "loss" is the concept that the insured suffered a detriment. For example in, *Level 3*, Judge Posner held that it was "clearly right" the insured did not suffer a "loss" on account of having to return the profit because the matter was a "wash," so the insured suffered no detriment. *Id.* As noted, the Fifth Circuit has also adopted the *Level 3* holding in *TransTexas*. *See John M. O'Quinn P.C. v.*, 33 F.Supp.3d at 770-71 (same). *See also, e.g., Cent. Dauphin Sch. Dist*, 426 A.2d at 97-98 (construing "loss" to include restitution "would defy common sense" and "disregard the plain and ordinary meaning of 'loss'"); *Ryerson*, 676 F.3d at 613 (adopting *Level 3*).

Yet other courts have analyzed the issue as one of public policy, concluding that insurance for restitution would surpass all allowable boundaries of "insurability" because the insured could profit from the insurance payment. For example, the California Supreme Court explained:

> When the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law.

*Bank of the W.*, 833 P.2d 545 at 548.

Permitting restitution to be insurable "would contravene the express purpose of restitution …, which is to deter wrongdoers from benefitting or otherwise profiting from their improper actions." *Executive Risk Indem.*, 451 F. Supp. 2d at 1162. *See also, e.g., J.P. Morgan Sec. Inc.*, 2 N.Y.S.3d at 423 ("the court should not have dismissed the affirmative defense invoking the public policy against permitting insurance coverage for disgorgement"). As explained by the court in *Ryerson*: "[If] disgorging such proceeds is included within the policy's definition of 'loss,' thieves could buy insurance against having to return money they stole. No one writes such insurance . . . and no state would enforce such an insurance policy if it were written." 676 F.3d at 612-13 (emphasis added).

No matter what the analytical and rhetorical path these cases take, they all arrive at the same point: Disgorgement is not an insured loss.

## CONCLUSION

For all of the reasons set forth above, Summary Judgment should be granted in favor of Twin City and an appropriate Declaratory Judgment should issue.

Respectfully Submitted,

CHAMBERLAIN, HRDLICKA, WHITE,
 WILLIAMS & AUGHTRY

By:*/s/ F. Daniel Knight*
F. Daniel Knight
State Bar No.: 24041265
S.D. Tex. Bar No.: 37344
Two Allen Center
1200 Smith Street, Suite 1400

Houston, Texas 77002
Telephone:  (713) 658-2571
Facsimile:  (713) 658-2553
daniel.knight@chamberlainlaw.com

OF COUNSEL:
CHAMBERLAIN, HRDLICKA, WHITE, WILLIAMS & AUGHTRY
Christine Kirchner
State Bar No.:
S.D. Tex. Bar No.:
Telephone:     (713) 654-9691
Facsimile:     (713) 658-2553
christine.kirchner@chamberlainlaw.com

-and-

SKARZYNSKI BLACK LLC
James Sandnes
Southern District of New York Bar No.: JS-1199
jsandnes@skarzynski.com
One Battery Park Plaza, 32nd Floor
New York, New York 10004
Telephone:  (212) 820-7700
Facsimile:  (212) 820-7740
*ADMITTED PRO HAC VICE*

## CERTIFICATE OF SERVICE

The undersigned verifies his Firm served a copy of the foregoing pleading, with attachments, upon counsel of record for the parties below in the manner described below in accordance with the Federal Rules of Civil Procedure on June 8, 2016.

*__Via Electronic Service__*
Mr. Jim Cooper
REED SMITH, LLP
811 Main Street, Suite 1700
Houston, Texas 77002

**Attorney for Oceeaneering International, Inc.;**
**John R. Huff; T. Jay Collins;**
**Jerold J. DesRoche; D. Michael Pappas;**
**Paul B. Murphy; David S. Hooker; and**
**M. Kevin McEvoy**


                                                   */s/ F. Daniel Knight*

33

F. Daniel Knight

4843-8897-2314
4852-3911-9922, v. 11
2175533.1
130644..000003